**The PEOPLE of the State of Colorado,**
**Plaintiff–Appellee,**

v.

**Gary PAHL, Defendant–Appellant.**

No. 01CA2020.

Colorado Court of Appeals,
Div. V.

Aug. 24, 2006.

Rehearing Denied Oct. 26, 2006.

Certiorari Denied Oct. 9, 2007.

172

John W. Suthers, Attorney General, Karen E. Lorenz, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

David S. Kaplan, Colorado State Public Defender, Kathleen A. Lord, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge BERNARD.

This opinion has been modified extensively. A complete copy of the new opinion follows.

Defendant, Gary Pahl, appeals the judgment of conviction entered upon jury verdicts finding him guilty of six counts of securities fraud, §§ 11–51–501 & 11–51–603, C.R.S. 2005; two counts of theft from an at-risk adult, § 18–6.5–103(5), C.R.S.2005; and one count of computer crime, Colo. Sess. Laws 1983, ch. 202, § 18–5.5–102(1) at 705–06. We affirm in part, reverse in part, and remand.

The evidence in this case established that defendant, in his capacity as president of Rautena Exploration Company, entered into a farmout agreement with Samson Oil Co. and Murfin Drilling Company. A farmout is an agreement in which one party contracts to perform drilling or exploratory operations on land leased by the other party. Under the terms of the farmout, Samson and Murfin transferred their oil and gas lease rights in Kiowa County, Colorado, to Rautena. Samson and Murfin retained a royalty interest, and Rautena agreed to drill a test oil well on the property.

Defendant contacted several people to solicit investments in the drilling operation, which he referred to as the "Salt Lake Prospect." Six people agreed to buy fractional working interests in the Salt Lake Prospect. Defendant agreed to drill the test well, and if the well produced oil, these investors would share in the profits. The investors signed a contract with defendant called a form 610 operating agreement. A form 610 agreement, also known as a joint operating agreement, is a commonly used form in the oil and gas industry to spread the risk of exploration among investors.

Months passed, however, and defendant did not drill the well. An investigation into Rautena's bank records revealed he had used the investors' money on personal expenses, and he had failed to disclose certain facts to them, specifically: (1) defendant had been advised by the State of Connecticut to cease and desist selling unregistered securities; (2) the Colorado Oil and Gas Conservation Commission had fined him for noncompliance with well drilling regulations; and (3) he had, in effect, abandoned his permit to drill a test well on the Salt Lake Prospect.

This appeal followed defendant's conviction of the offenses listed above.

## I. Motion to Suppress

■ Defendant contends the trial court erred in denying his motion to suppress evidence seized as a result of a search of his home conducted pursuant to a warrant. We disagree.

■ A trial court's ruling on a motion to suppress presents a mixed question of fact and law. *People v. Medina*, 25 P.3d 1216 (Colo.2001). An appellate court must defer to the trial court's findings of fact if they are supported by competent evidence in the record, but reviews its conclusions of law de novo. *People v. Garcia*, 11 P.3d 449 (Colo. 2000).

### A. Facts and Trial Court Ruling

One of the investors filed a complaint with the Colorado Division of Securities concerning money he had invested with Rautena in the Salt Lake Prospect. An investigator for the Division subpoenaed bank account records for Rautena and met with defendant. Defendant informed her he was having problems getting the well drilled and he would return the investors' money. He failed to do so, however, and further investigation revealed he had commingled the money with his personal funds and had also failed to

disclose certain material facts to the investors before they decided to invest.

The trial court found that, based on this information, the investigator obtained a warrant for defendant's arrest. The investigator and two police officers went to defendant's home to execute the warrant. When they knocked on the door, defendant answered and stepped outside. He was holding a document describing an oil and gas venture, which he dropped on the ground when the officers placed him under arrest. Although defendant told the officers they could not search his home without a warrant, the investigator did so anyway.

The investigator subsequently prepared a search warrant for defendant's home, and his computer and several documents related to Rautena were seized when the warrant was executed. Defendant filed a motion to suppress.

At the hearing, the investigator testified she entered defendant's home out of concern for officer safety. The trial court found her testimony on this issue was not credible and ruled that the warrantless search was illegal.

However, the trial court denied the motion to suppress because it concluded, after redacting the portions of the affidavit in support of the search warrant based on the illegal search, that the remaining information established probable cause. The court also noted that the search and seizure could be upheld under the inevitable discovery doctrine.

### B. Validity of the Search Warrant

█ Under the Fourth Amendment, a search warrant must be supported by probable cause, which must exist within the four corners of the affidavit. U.S. Const. amend. IV; Colo. Const. art. II, § 7; *People v. Gall*, 30 P.3d 145 (Colo.2001); *People v. Randolph*, 4 P.3d 477 (Colo.2000).

█ Where an affidavit includes information obtained unlawfully from a previous warrantless search as well as information from lawful origins, evidence discovered by execution of the search warrant is admissible if the search pursuant to the warrant was supported by information from sources independent of the unlawfully procured information. *People v. Schoondermark*, 759 P.2d 715 (Colo.1988). A court reviewing the legality of a search conducted pursuant to such an affidavit must answer two questions: was the officers' decision to seek a search warrant motivated by what they observed during the illegal search; and what effect did the illegally obtained evidence have on the decision of the magistrate issuing the search warrant? *People v. Schoondermark, supra.*

█ The *Schoondermark* test points out significant differences between the inevitable discovery doctrine and the independent source doctrine. As relevant here, the former requires that at the time the illegal search occurred, the police must be pursuing other lawful avenues which would have uncovered the evidence. *People v. Diaz*, 53 P.3d 1171 (Colo.2002). The latter focuses upon whether a search pursuant to a warrant, following an illegal search, was based upon information independent from what was observed during the illegal search. *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) (valid warrant obtained after illegal entry); *People v. Schoondermark, supra* (same).

The People argue the proper test to apply in these circumstances is instead found in *People v. Hebert*, 46 P.3d 473 (Colo.2002). There, the supreme court held that a search warrant is valid if the lawfully obtained information, considered alone, establishes probable cause to issue the warrant. The court held the police officers' warrantless entry into the defendant's home was not justified by the emergency aid exception to the warrant requirement, but that the affidavit for a search warrant provided sufficient probable cause to support the warrant after the illegally obtained information was redacted.

Defendant does not contest the trial court's ruling that the redacted affidavit established probable cause. Instead, citing *People v. Cruse*, 58 P.3d 1114 (Colo.App. 2002), he contends *Hebert* is inapplicable when police conduct an illegal search of the premises and then include information obtained in that search in the application for a warrant to search the same premises. In

*Cruse,* a division of this court applied *Schoondermark,* while noting *Hebert* might impose a different standard.

There is no indication in *Hebert* that it overrules *Schoondermark.* On the contrary, *Hebert* never mentions *Schoondermark,* nor *Murray v. United States, supra,* the case *Schoondermark* relied upon in its analysis of the independent source doctrine. We are unaware of any subsequent Colorado Supreme Court case that indicates *Schoondermark* is no longer good law after *Hebert.* Because *Schoondermark* is direct binding precedent on this precise issue, we are bound by it.

On rehearing, defendant cites *People v. Briggs,* 709 P.2d 911 (Colo.1985), and argues we should not consider the independent source doctrine because the prosecution did not rely on it before the trial court. We disagree.

As part of his argument opposing the prosecution's reliance on *People v. Hebert, supra,* defendant referred to *People v. Cruse, supra,* in his reply brief. Defendant also provided a short discussion of the independent source doctrine, citing *Murray v. United States, supra,* and *People v. Schoondermark, supra.* While defendant noted the prosecution had not "invoked" the independent source doctrine in this case, it is clear defendant desired us to follow *Cruse* instead of *Hebert.*

*Cruse* held that, because we review the legal test applied in a suppression hearing de novo, we are obligated to apply the correct standard. *People v. Cruse, supra.* The supreme court took this same approach in *People v. Schoondermark, supra,* when it relied sua sponte on the independent source doctrine rather than the inevitable discovery argument the prosecution advanced.

### 1. Officers' Decision to Seek a Warrant

First, the trial court must find that the officers' decision to seek a search warrant was independent of their observations during the illegal entry. *People v. Schoondermark, supra; People v. Cruse, supra.* In both *Schoondermark* and *Cruse,* the court remanded the case because the trial court did not determine whether the officers' observa-tions during the illegal entry affected their decision to seek a warrant.

Here, we need not remand because the trial court made the requisite factual finding, even though it did so in the context of deciding that the inevitable discovery doctrine would apply. *See Lindsey v. People,* 892 P.2d 281 (Colo.1995)(a correct result will be upheld on review even if the trial court reached it through an incorrect analysis), *abrogated on other grounds by People v. Shreck,* 22 P.3d 68 (Colo.2001); *People v. Schoondermark, supra* (court applied independent source doctrine even though prosecution relied upon inevitable discovery doctrine).

The search warrant affidavit outlined the fruits of the investigation before defendant's arrest, including descriptions of the oral and documentary representations he made to investors, important information he failed to reveal to them, a preliminary analysis of defendant's bank account indicating he used at least some of the money from the investors for personal purposes, and information that, after he was interviewed by an investigator from the Division of Securities about this case, he mailed many solicitations to other potential investors. The affidavit also noted that, at the time of defendant's interview, he lived at the address where he was later arrested.

This information was supplemented by observations made at the time of defendant's arrest, both before and after the unlawful search occurred. Defendant was placed into custody before the warrantless search. During this contact, defendant dropped a brochure entitled "Proforma Three Well Drilling Program 25% Equity Divesture Income Participation Offer," which named him as the program's president, indicated the program was in Kiowa County, referred to a different company name than Rautena (Gap Exploration, Inc.), and listed this company's address as the address where defendant was arrested.

The information in the affidavit generated by the unlawful search consisted of the investigator's observations inside defendant's residence. Specifically, the investigator saw a computer in a room amid documents relating

to both Rautena and Gap Exploration and some bank records.

After redacting the evidence obtained pursuant to the illegal search from the affidavit, taking into consideration information learned in the course of the investigation, and characterizing the brochure defendant dropped at the time of his arrest as a "smoking gun," the trial court concluded it was "eminently reasonable that a search of this apartment would have occurred and these items discovered." Thus, the record supports the trial court's conclusion that the later search and seizure were independent of the initial illegal entry.

### 2. Magistrate's Decision to Issue the Warrant

■ Whether illegally obtained information included in a search warrant affidavit affected the magistrate's decision to issue the warrant is a question of law, which an appellate court reviews de novo. *People v. Cruse, supra.*

In *Cruse,* the division concluded the magistrate would have issued the search warrant even if presented with an affidavit omitting the information gleaned from the illegal search, because the lawfully obtained information in the affidavit established probable cause. Here, based upon the information in the affidavit from sources independent of the observations made during the unlawful search, the trial court found, and we concur, there was probable cause to search defendant's residence.

Accordingly, the search and seizure of defendant's home was lawful, and therefore, the trial court did not err in denying his motion to suppress.

### II. Variance

Defendant contends that the definitional instruction for a security impermissibly expanded the securities fraud charges alleged in the indictment. We disagree.

■ An indictment must be definite enough to give a defendant sufficient notice of the crime alleged to prepare a defense, and must recite the essential facts of the crime to protect him from further prosecution for the same offense. Crim. P. 7(a)(2); *People v. Buckallew,* 848 P.2d 904 (Colo. 1993). The prosecution cannot require a defendant to answer a charge not alleged in the indictment. *Schmuck v. United States,* 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989); *People v. Madden,* 111 P.3d 452 (Colo.2005).

### A. Simple Variance or Constructive Amendment

■ There are two types of variances between the charge contained in the indictment and the charge of which a defendant is convicted. *People v. Rodriguez,* 914 P.2d 230 (Colo.1996). A simple variance occurs when the charged elements are unchanged, but the evidence presented at trial proves facts materially different from those alleged in the indictment. "[C]onvictions generally have been sustained as long as the proof upon which they were based corresponds to *an offense* that was clearly set out in the indictment." *People v. Rodriguez, supra,* 914 P.2d at 257 (quoting *United States v. Miller,* 471 U.S. 130, 136, 105 S.Ct. 1811, 1815, 85 L.Ed.2d 99 (1985)).

■ A constructive amendment occurs when jury instructions change an element of the charged offense to the extent the amendment "effectively subject[s] a defendant to the risk of conviction for an offense that was not originally charged." *People v. Rodriguez, supra,* 914 P.2d at 257 (quoting *United States v. Mosley,* 965 F.2d 906, 915 (10th Cir.1992)).

■ A simple variance does not require reversal unless it prejudices the defendant's substantial rights, but a constructive amendment is reversible per se. *People v. Huynh,* 98 P.3d 907 (Colo.App.2004); *People v. Carlson,* 72 P.3d 411 (Colo.App.2003).

Defendant contends the instructional variance was a constructive amendment because it changed the nature of the critical disputed element, whether the agreement between him and the investors was a security. We are not persuaded.

In *Rodriguez,* the defendant was charged with sexual assault by an information listing

a particular means of committing the crime. At trial, the court permitted a definitional instruction of sexual penetration including several other means of committing the crime in addition to the means alleged in the information. The court held that the elemental instruction for sexual assault did not impermissibly amend the information, because the specification of the particular manner in which the defendant·committed the element of sexual penetration was an evidentiary detail that the information did not need to state.

In reaching its conclusion, the court distinguished *People v. Tucker*, 631 P.2d 162 (Colo. 1981), which held that an indictment for embezzlement was insufficient where it tracked the statutory language, but failed to specify how the embezzlement was accomplished. The *Rodriguez* court reasoned that, unlike embezzlement, which can be accomplished in numerous ways, sexual assault can only be committed in a limited number of ways, each of which is enumerated by statute.

Here, the indictment charged defendant with securities fraud "in connection with the offer, sale, or purchase of a security, to-wit: certificate of participation in an oil, gas, or mining title or lease, or payments out of production thereof." The elemental jury instruction listed one of the elements of fraud to be specified conduct "in connection with the offer, sale, or purchase of any security." Thus, the crime of securities fraud alleged in the indictment was the same as that contained in the elemental jury instruction for securities fraud.

The specific types of instruments or transactions constituting a security are listed by statute. *See* § 11–51–201(17), C.R.S.2005. Here, the definitional jury instruction for the term "security" included several of these: "any certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under such title or lease, or an investment contract [and] ... also ... a partnership or a joint venture depending on the totality of the circumstances." By adding other components of the statutory definition of "security" to the one listed in the indictment, the instruction did not change the elements of the offense,

as the prosecution still had to prove defendant engaged in specified conduct in connection with a security. *See People v. Rodriguez, supra; People v. Carlson, supra* (no constructive amendment in theft case when proof at trial did not include all the "things of value" listed in indictment); *State v. Danek*, 118 N.M. 8, 878 P.2d 326 (1994) (altering an instruction defining "security" did not alter the instruction setting out the elements of the crime).

Thus, we conclude the difference between the indictment and the jury instructions was a simple variance and not a constructive amendment.

### B. Prejudice

██ A simple variance is not grounds for reversal unless it is material to the merits of the case or prejudicial to the defendant. Section 16–10–202, C.R.S.2005; *People v. Rodriguez, supra*. A reviewing court considers the surrounding circumstances when determining whether a simple variance in an information caused prejudice. *People v. Williams*, 984 P.2d 56 (Colo.1999).

Here, defendant does not complain he was unaware of the essential facts in support of the securities fraud charges. He does not argue he would have challenged the prosecution's case differently, nor does he indicate he could have produced different evidence in his defense. Moreover, defendant did not file a motion for a bill of particulars to clarify the indictment. *See* Crim. P. 7(g). Under these circumstances, we conclude the variance did not prejudice defendant's substantial rights.

### III. Sufficiency of Evidence of Securities Fraud

██ Defendant contends the evidence was insufficient to sustain his convictions for securities fraud. We disagree.

██ Where the sufficiency of the evidence is challenged on appeal, an appellate court reviews whether the evidence, viewed as a whole and in the light most favorable to the prosecution, could support a finding of guilt beyond a reasonable doubt. In that respect, the prosecution is entitled to the

benefit of every reasonable inference that might be drawn from the evidence. *People v. Fell*, 832 P.2d 1015 (Colo.App.1991).

#### A. Security: Judge or Jury Question

 As an initial matter, defendant contends the trial court erred in submitting to the jury the issue of whether the joint operating agreement was a security. He maintains the issue is a question of law for the court. We disagree.

Defendant relies on *Straub v. Mountain Trails Resort, Inc.*, 770 P.2d 1321, 1323 (Colo.App.1988), in which a division of this court stated, "Whether an interest or instrument is an investment contract is a question of law to be determined by the court."

Defendant's reliance on *Straub* is misplaced. *Straub* was a civil securities fraud case. It did not address whether, in criminal cases, the court should decide a document is a security, as a matter of law, instead of submitting that determination to a jury.

In *United States v. Johnson*, 718 F.2d 1317 (5th Cir.1983), the court held it was the jury's responsibility to apply the facts to the definition of "security" supplied by the court to decide whether the document was a security. In *United States v. Rogers*, 9 F.3d 1025 (2d Cir.1993), the court of appeals observed it may have been appropriate for the trial court to make a preliminary determination of whether an instrument could be a security. However, if the instrument satisfied this scrutiny, the defendant was entitled to have the jury instructed on the appropriate definition so it could decide whether the instrument was a security.

In *People v. Blair*, 195 Colo. 462, 579 P.2d 1133 (1978), the trial court submitted to the jury the issue of whether a particular trust was a security in a prosecution for violations of the Colorado Securities Act. On appeal, the court found the evidence presented at trial was sufficient to support the jury's finding that the trust was a security, thereby accepting the trial court's ruling that the issue was a jury question. *See People v. Vance*, 933 P.2d 576 (Colo.1997) (jury must resolve whether a false statement is material in a perjury prosecution), *overruled on other grounds by Griego v. People*, 19 P.3d 1 (Colo. 2001).

In this case, defendant had the benefit of both a preliminary judicial determination and a jury finding, after proper instruction, that the form 610 agreement was a security. The court denied defendant's motions for judgment of acquittal, which were partially based upon defendant's position that the agreement was not a security. Thus, any right defendant had to a legal determination of whether the instrument in this case was a security was satisfied by the trial court's finding that there was sufficient evidence in this regard to send the case to the jury.

Accordingly, we conclude the trial court did not err in permitting the jury to resolve whether the Salt Lake Prospect involved a security.

#### B. Sufficiency of the Evidence of a Security

Defendant argues there was insufficient evidence that the joint operating agreement was a security. We reject his argument.

##### 1. Certificate of Participation

First, defendant contends the security alleged in the indictment was a "certificate of participation in an oil, gas, or mining title or lease." He reasons that, because an accused can only be convicted of the offense described in the indictment, the securities fraud convictions must be reversed because the prosecution did not present any evidence that the joint operating agreement was a certificate of participation.

We have already resolved the constructive amendment argument against defendant. Thus, the fact the prosecution did not present evidence that the joint operating agreement was a certificate of participation, as opposed to some other component of the definition of a security, does not end our inquiry.

##### 2. Investment Contract

At trial, the prosecution argued the Salt Lake Prospect was a type of security called an investment contract. Defendant contends that, even if joint operating agreements can

be characterized generally as investment contracts, and therefore securities, the drilling venture at issue here was not an investment contract. Thus, defendant argues, there is insufficient evidence to sustain his convictions for securities fraud. We disagree.

In *Securities & Exchange Commission v. W.J. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946), the Supreme Court held that the test for distinguishing an investment contract, which is subject to federal securities laws, from other commercial dealings, which are not subject to those laws, is "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others."

Defendant relies heavily on *Stewart v. Ragland*, 934 F.2d 1033 (9th Cir.1991), in which the court applied the *Howey* test to a form 610 joint operating agreement for a working interest in an oil and gas lease and concluded it was not an investment contract and, therefore, not a security pursuant to the definition of "security" found in 15 U.S.C. § 77b(a)(1). However, *Stewart* does not control this case for two reasons.

First, it appears to be an anomaly. Despite the presence of the phrase "fractional undivided interest in oil, gas, or other mineral rights" in the federal statutory definition of security, the *Stewart* court, without explanation, resolved the case based upon whether the agreement before it was an investment contract. *See Landreth Timber Co. v. Landreth*, 471 U.S. 681, 692, 105 S.Ct. 2297, 2305, 85 L.Ed.2d 692 (1985) (*Howey* test is applied only to determine whether an instrument is an "investment contract," not whether instruments falling under other examples enumerated in the definition are securities); *Cascade Energy & Metals Corp. v. Banks*, 896 F.2d 1557, 1580 (10th Cir.1990)("[W]hen an instrument falls 'plainly within the statutory definition' of a security, '[t] here is no need ... to look beyond the characteristics of the instrument to determine whether the [federal securities] Acts apply.'" (quoting *Landreth Timber Co. v. Landreth, supra*, 471 U.S. at 690, 105 S.Ct. at 2304)).

Second, *Stewart's* holding was based on the facts of the agreement in that case. The Ninth Circuit Court of Appeals focused on the agreement's allocation of significant power to the partners, who shared equal involvement and risk, to control and direct the actions of the person who organized the endeavor.

Most other courts have determined that working interests in oil and gas exploration efforts are investment contracts, and therefore securities, under 15 U.S.C. § 77b(a)(1) or under a state's definition of the term. *See Sec. & Exch. Comm'n v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943); *San Francisco–Okla. Petroleum Exploration Corp. v. Carstan Oil Co.*, 765 F.2d 962 (10th Cir.1985)(instrument was a "fractional undivided interest in oil gas and other mineral rights," but, if not, it was an investment contract); *Parvin v. Davis Oil Co.*, 524 F.2d 112 (9th Cir.1975)(same); *Anderson v. Vinson Exploration, Inc.*, 832 S.W.2d 657 (Tex.App.1992)(evidence was sufficient to create a jury question as to whether an investment contract was involved in an oil and gas lease joint operating agreement; Texas's definition of "security" found in Texas Rev. Civ. Stat. art. 58–14A similar to definition in 15 U.S.C. § 77b(a)(1) ); *Shepperd v. Boettcher & Co.*, 756 P.2d 182 (Wyo. 1988)(sale of working interest in an oil and gas lease may constitute a security depending on the circumstances of the transaction; Wyoming's definition of "security" found in Wy. Stat. Ann. § 17–4–113 similar to definition in 15 U.S.C. § 77b(a)(1) ).

Colorado's definition of a "security" does not contain specific language referring to fractional interests in oil or gas rights, although it refers to a "certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under such a title or lease." *Compare* § 11–51–201(17) *with* 15 U.S.C. § 77b(a)(1). However, a security under the Colorado Securities Act includes an investment contract and "any interest or instrument commonly known as a security." The fact that fractional undivided interests in oil or gas rights, the investors' interests in this case, are specifically included in the federal statute lends support to their

inclusion in the Colorado Securities Act as either an investment contract or "any other interest or instrument commonly known as a security."

Here, the prosecution presented evidence that the investors' interest in defendant's exploration was an investment contract and, therefore, a security. A former commissioner of the Colorado Division of Securities testified that the joint operating agreement between defendant and the investors was an investment contract, applying the *Howey* test. In addition, much of the investors' testimony concerned the third factor of the *Howey* test, that is, the degree of control they retained over the Salt Lake Prospect.

In support of his argument that there was insufficient evidence that the document was an investment contract, defendant emphasizes that on cross-examination, the former commissioner conceded that he could not remember the Division's ever filing a securities action based on a form 610 operating agreement. Defendant also points out some of the investors admitted they did not believe they were purchasing a security when they invested in the Salt Lake Prospect.

We conclude neither of these facts controls the outcome of this case. While there may be law from other jurisdictions that raises the issue of whether a particular joint operating agreement is an investment contract, or whether such an interest is a security, we are convinced the law is sufficiently clear that a joint operating agreement can be a security. In that regard, the investors' subjective beliefs as to whether they were purchasing a security or some other form of investment are not dispositive. *See Jenkins v. Jacobs,* 748 P.2d 1318 (Colo.App.1987)(whether a transaction is a security does not depend on the label it is given, but upon the substance and economic realities of the situation). This is especially so because the statutes making securities fraud a crime, §§ 11–51–501 & 11–51–603, do not require proof of the victim's belief as an element of the offense.

Defendant argues that, like the investors here, the investors in *Stewart v. Ragland, supra,* were sophisticated and knowledgeable about the oil and gas industry, and therefore did not need the protection of securities laws.

Although the *Stewart* court found this fact significant, it alone is not determinative. *See San Francisco–Okla. Petroleum Exploration Corp. v. Carstan Oil Co., supra* (fact that sales of working interests in oil well were between parties experienced in the oil business did not preclude finding that interests were securities).

Defendant also submits the form 610 joint operating contract was not an investment contract under the *Howey* test because the investors retained significant managerial control over the enterprise. The investors in this case had certain rights they could exercise if specific conditions arose, like removing, by majority vote, defendant from his managerial role if he failed to fulfill it. However, the form 610 stated defendant would "conduct and have full control of all operations" and was not subject to the investors' "control and direction ... except as to the type of operation to be undertaken." This language makes it clear the investors did not have "substantial power to affect the success of the enterprise." *People v. Blair, supra,* 195 Colo. at 473, 579 P.2d at 1141–42 (quoting *Sec. & Exch. Comm'n v. Heritage Trust Co.,* 402 F.Supp. 744 (D.Ariz.1975)). Therefore, under the *Howey* test, there was sufficient evidence to support a determination that the form 610 agreement was an investment contract and, therefore, a security. *See Toothman v. Freeborn & Peters,* 80 P.3d 804 (Colo.App.2002).

In sum, the law on whether a joint operating agreement is an investment contract or otherwise a security is not so one-sided as to prevent a jury from considering the issue. Viewing the evidence as a whole and in the light most favorable to the prosecution, we therefore conclude reasonable jurors could find the agreement between defendant and the investors was a security. Hence, there was sufficient evidence to support the securities fraud convictions.

## IV. Testimony of Former Securities Commissioner

Defendant contends the trial court erred in permitting the former commissioner of the Colorado Division of Securities to tes-

tify as an expert witness. Although it is a close question, we disagree.

A trial court has broad discretion to determine the admissibility of expert testimony under CRE 702, and the exercise of that discretion will not be overturned on appeal absent an abuse of discretion. *People v. Wilkerson,* 114 P.3d 874 (Colo.2005).

Expert testimony is admissible if the expert's specialized knowledge will assist the jury to understand the evidence or to determine a fact in issue. CRE 702; *People v. Shreck, supra.* Expert testimony that is otherwise admissible is not objectionable because it embraces an ultimate issue of fact. CRE 704; *People v. Prendergast,* 87 P.3d 175 (Colo.App.2003). However, an expert may not usurp the function of the court by expressing an opinion on the applicable law or legal standards. *Quintana v. City of Westminster,* 8 P.3d 527 (Colo.App.2000).

Defendant argues the former commissioner usurped the trial court's role by telling the jury that the transaction was a security. However, we have concluded that the trial court properly submitted the issue of whether the transaction was a security to the jury, and thus, we reject this argument.

Defendant also argues there was an intolerable risk the jury convicted him because the commissioner expressed his opinions that the transaction was a security and that defendant's omissions of fact were material. We are not persuaded, because, under the trial court's instructions, the jury was free to reject the commissioner's opinion. *See People v. Rivera,* 56 P.3d 1155 (Colo.App.2002)(whatever an expert or lay witness opines with respect to an ultimate issue, the jury retains its authority to determine the facts from the evidence and accept or reject the opinion).

In addition, the court instructed the jury: it was not bound by expert testimony; such testimony should be weighed like the testimony of any other witness; the jury could believe all of a witness's testimony, part of it, or none of it; the mere number of witnesses appearing for or against a proposition does not, in and of itself, prove or disprove the proposition; and the jury should follow the law as instructed by the court.

Finally, defendant urges us to decline to follow the decisions of two divisions of this court, *People v. Rivera, supra,* and *People v. Prendergast, supra.* In each case, the division concluded the trial court did not err in permitting a commissioner of the Colorado Division of Securities to testify on an ultimate issue of fact for the jury in a securities fraud case. *See People v. Rivera, supra* (admitting testimony regarding whether a limited partnership agreement was a security); *People v. Prendergast, supra* (admitting testimony regarding definition of a material statement). We see no reason to reject this precedent, as these opinions contain proper discussions of the role and limits of expert testimony.

It is certainly possible for expert testimony to cross the line from acceptable opinion to unacceptable interference with the court's or the jury's role. The kind of testimony presented in this case risks crossing that line, putting convictions in jeopardy of reversal, because it could rise to the level of a pronouncement of law. However, under the facts and authority previously discussed, we conclude the expert's opinion in this case did not invade the jury's province or usurp the trial court's responsibility.

Accordingly, the trial court did not err in admitting expert testimony from the former commissioner of the Colorado Division of Securities.

## V. Jury Instructions

Defendant challenges several of the jury instructions relating to the securities fraud and computer crime charges.

### A. Security

Defendant first contends the trial court erroneously instructed the jury on the meaning of a security. We disagree.

The People argue defendant failed to preserve this assignment of error because he did not object specifically to the jury instruction defining a security. Instead, he tendered several instructions describing the circumstances under which a partnership or

joint venture is a security. We do not interpret the objection requirement so strictly.

The purpose of the contemporaneous objection rule is to conserve judicial resources by alerting the trial court to a particular issue in order to give the court an opportunity to correct any error that could otherwise jeopardize a defendant's right to a fair trial. *See People v. Smith,* 121 P.3d 243 (Colo.App.2005)(Webb, J., specially concurring).

Here, defendant tendered alternative instructions and thereby put the trial court on notice of his position that the prosecution's instructions were inadequate, thus distinguishing his case from those in which the defendant registered no opposition at all. *See, e.g., People v. Galimanis,* 944 P.2d 626 (Colo.App.1997)(applying plain error standard of review where defendant neither objected to jury instructions nor tendered alternative instructions); *People v. Williams,* 899 P.2d 306 (Colo.App.1995)(same). Therefore, we conclude the error was preserved.

A trial court has a duty to instruct the jury correctly on the law applicable to the case. *People v. Weinreich,* 119 P.3d 1073 (Colo.2005). Reversible error occurs if the language of the jury instructions creates a reasonable possibility that the jury could have been misled in reaching a verdict. *People v. Silva,* 987 P.2d 909 (Colo.App.1999).

However, the trial court has substantial discretion in formulating the jury instructions so long as they are correct statements of the law and fairly and adequately cover the issues presented. *People v. Williams,* 23 P.3d 1229 (Colo.App.2000). A conviction will not be reversed on a claimed deficiency in a jury instruction if the instructions, read as a whole, adequately inform the jury of the law. *People v. Vanrees,* 125 P.3d 403 (Colo.2005).

The trial court gave the following instruction on the meaning of a security:

A "security" means any certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under such title or lease, or an investment contract. A security may also be a partnership or a joint venture depending upon the totality of the circumstances.

An "investment contract" means an investment of money in a common enterprise with an expectation of profit from the essential managerial efforts of the promoter or a third party.

A "joint venture" is a type of relationship under the law of partnership and agency. A joint venture exists when there is (1) a joint interest in property; (2) an express or implied agreement to share in profits or losses of the venture; and (3) actions and conduct showing joint cooperation in the venture.

A "partnership" is an association of two or more persons to carry on, as co-owners, a business for profit and includes, without limitation, a registered limited liability partnership.

Defendant argues the instruction is erroneous because it led the jury to believe that a partnership or joint venture could be a security depending on the totality of the circumstances, but gave the jury no guidance as to what circumstances could support the finding. We do not agree.

The determination of whether a general partnership or joint venture is an investment contract, and therefore a security, is to be made on the basis of substance or economic reality, not form. *Williamson v. Tucker,* 645 F.2d 404 (5th Cir.1981). This determination is necessarily a fact-specific inquiry.

At trial, the investors testified defendant was the one responsible for drilling the well and they had no active role. Defendant argued the agreement was not a security because the investors retained control over their investment. The jury was given a definition of an investment contract, and was instructed to consider the totality of the circumstances in determining whether the venture was a security; this instruction was an adequate explanation of the law.

Defendant tendered three additional instructions extracted from various court opinions. As a general rule, the use of an excerpt from an opinion in a jury instruction is an unwise practice because opinions and

instructions have very different purposes. *See Evans v. People,* 706 P.2d 795 (Colo. 1985). Although language in an opinion may be a correct statement of the law as related to the facts and issues in the case, it may not be "sufficiently general, clear, or accurate to serve as a satisfactory or full instruction to a jury." *Cohen v. People,* 106 Colo. 245, 247, 103 P.2d 479, 480 (1940) (quoted in *Evans v. People, supra,* 706 P.2d at 800). Defendant's first instruction stated: "Units in general partnerships are not generally considered to be investment contracts and thus, are not normally considered 'securities' within the meaning of the law."

This is a correct statement of a general principle, but its omission under the facts of this case was, at most, harmless. *Toothman v. Freeborn & Peters, supra,* 80 P.3d at 811 indicated, "[b]ecause general partners have a legal right to participate in the management of the partnership, an interest in a general partnership is presumed not to be an investment contract." The division also observed, however, that this presumption does not apply to limited partners or passive investors, because they are not directly involved in managing the affairs of the partnership.

Under the facts of this case, the investors did not, as indicated above, directly participate in managing the affairs of the drilling operation. They were, under *Toothman,* limited partners or passive investors, rather than general partners.

Further, the jury was properly instructed on the definition of an investment contract and told it must examine the totality of the circumstances to determine whether the agreement was a security. Defendant also argued the agreement was not a security because the investors retained control over the investment. Thus, as defendant's theory was placed before the jury and a proper instruction defining an investment contract was given, there is no reasonable possibility defendant suffered any prejudice because this instruction was not given.

Defendant's second instruction provided:

A general partnership or joint venture interest can be designated a security if the investor can establish that

(1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or

(2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or

(3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.

This instruction quotes three factors that the Fifth Circuit set forth as examples of when a partnership qualifies as a security. *Williamson v. Tucker, supra,* 645 F.2d at 424. However, defendant omits the "for example" language in the opinion and incorrectly suggests other factors may not be considered in determining whether the investors' interests were securities. *See Feigin v. Digital Interactive Assocs., Inc.,* 987 P.2d 876 (Colo.App.1999)(noting that *Williamson* set forth a nonexclusive list). Read together with defendant's first instruction, the other two are incomplete and misleading. Hence, the trial court properly refused them.

Defendant's third instruction was embodied in another instruction, and therefore, the trial court did not err in refusing it. *See People v. Lee,* 199 Colo. 301, 607 P.2d 998 (1980) (the court may properly refuse an instruction tendered by the defense where the contents of that instruction are embodied in the court's other instructions).

## B. Scienter

Defendant also challenges several aspects of the trial court's instruction on the scienter element of securities fraud.

### 1. Specific Intent or Willfully

■ Defendant contends the trial court erred in requiring the jury to find he acted willfully, instead of with specific intent. We disagree.

In *People v. Blair, supra,* the supreme court held that "willfully" was the proper mental state for securities fraud. *Accord People v. Riley,* 708 P.2d 1359 (Colo.1985); *People v. Rivera, supra.* Indeed, the criminal securities fraud statute requires that a defendant act willfully. *See* § 11–51–603(1), C.R.S.2005 (any person who willfully violates the provisions of § 11–51–501, the securities fraud statute, commits a class 3 felony).

Here, the trial court's instruction tracked the language of the securities fraud statute, § 11–51–501. The court also gave an instruction on the statutory definition of "willfully." *See* § 18–1–501(6), C.R.S.2005. Thus, there was no error in these instructions. *See People v. Jacobs,* 91 P.3d 438 (Colo.App.2003)(an elemental jury instruction tracking the language of the applicable statute is almost always sufficient).

### 2. Indirectly, Willfully

 Defendant also contends the elemental instruction for securities fraud was erroneous because it read that defendant "directly or indirectly, willfully employed any device, scheme or artifice to defraud." He argues a person cannot act both indirectly and willfully. We disagree.

"Indirectly" means "not resulting directly or immediately, as effects or consequences." *Webster's New Collegiate Dictionary* 684 (3d ed.1991). A person acts "willfully" when "he is aware that his conduct is practically certain to cause the result." Section 18–1–501(6). People can be aware their conduct is practically certain to cause a particular result where the result is an indirect product of their conduct, or where people are aware the result will be caused by others through whom they work to achieve the result. Contrary to defendant's contention, the two terms are not mutually exclusive.

### 3. Knowledge That Transaction Is a Security

 Defendant also contends the trial court erred in instructing the jury the prosecution did not have to prove he was aware he was selling was a security. We disagree.

 "There is no requirement that the defendant purposely intended to violate the law in order to be held criminally liable." *People v. Blair, supra,* 195 Colo. at 469, 579 P.2d at 1139. For that reason, the *Blair* court rejected the defendant's tendered instruction that, to convict him of securities fraud, the prosecution must prove he purposefully intended to violate the law.

Similarly, in *People v. Rivera, supra,* a division of this court rejected the argument that the mental state "willfully" required the prosecution to prove the defendant knew the stock she sold was a security. Defendant urges us to reject *Rivera.* We see no reason to do so.

 Colorado's securities statutes are modeled after federal securities laws. As a result, interpretations of federal law are helpful in interpreting Colorado's law. Because one of the goals of Colorado's securities statutory scheme is to address all potential fraud, its provisions are interpreted broadly, like their federal counterparts. Requiring proof of a defendant's awareness that an instrument is a security would undermine the statute's purpose, because the definition of security is intended to be flexible. *People v. Rivera, supra.*

As a division of this court pointed out in *Rivera,* federal courts have rejected the argument that it must be shown, beyond a reasonable doubt, a defendant knew an instrument was a security in order to prove the defendant willfully violated the law. *See United States v. Brown,* 578 F.2d 1280 (9th Cir.1978). Federal precedent is especially compelling in this context because of the parallel language of the federal and Colorado statutes. *Compare* 15 U.S.C. §§ 77q, 77x *with* §§ 11–51–501(1), 11–51–603(1).

Further, the mental state of "willfully" only requires the actor to be "aware that his conduct is of such nature or that such circumstance exists." Section 18–1–501(6). To require proof defendant knew he was selling a security would go beyond the statutory requirement and rise to the level of a conscious objective, which is appropriate only for specific intent crimes. *See People v. Witek,* 97 P.3d 240 (Colo.App.2004); *People v. Yascavage,* 80 P.3d 899 (Colo.App.2003).

Hence, the trial court did not err in instructing the jury on the mental state for securities fraud.

### C. Specific Material Statements and Omissions

■ Defendant also contends the trial court erred in rejecting his instruction that the jury should only consider the material statements and omissions alleged in the indictment. However, he does not identify in the record what other material statements or omissions, if any, the jury could have found. *See* C.A.R. 28(a)(4); *Brighton Sch. Dist. 27J v. Transamerica Premier Ins. Co.,* 923 P.2d 328 (Colo.App.1996)(it is not the duty of the reviewing court to search the record in support of a party's assertions), *aff'd,* 940 P.2d 348 (Colo.1997). Because defendant has not directed us to the places in the record where he believes material statements or omissions beyond those in the indictment are to be found, we are unable to evaluate the merit of his claim.

### D. Computer Crime

Defendant also contends the elemental jury instruction for computer crime was erroneous. We disagree.

Defendant did not object to the jury instruction on the elements of computer crime. When no contemporaneous objection is made to an asserted error, appellate review is limited to determining whether there is plain error. Crim. P. 52(b); *People v. Phillips,* 91 P.3d 476 (Colo.App.2004).

■■ Plain error is error that seriously affects the substantial rights of the defendant and occurs when, after a review of the entire record, a court can conclude with fair assurance that the error so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. *Moore v. People,* 925 P.2d 264 (Colo.1996); *People v. Villarreal,* 131 P.3d 1119 (Colo.App.2005). The court's failure to instruct the jury properly does not constitute plain error if the relevant instruction, read in conjunction with other instructions, adequately informs the jury of the law.

*People v. Miller,* 113 P.3d 743 (Colo.2005); *People v. Harlan,* 8 P.3d 448 (Colo.2000).

■ The trial court gave the following jury instruction on the elements of computer crime:

1. That the defendant,

2. in the state of Colorado, at or about the date and place charged,

3. knowingly

 a. accessed any computer or any part thereof

 b. to commit theft, and

4. the loss or the value of the thing taken was fifteen thousand dollars or more.

Defendant argues the instruction is erroneous because the applicable version of the computer crime statute requires an accused to access the computer "for the purpose of committing theft," whereas the instruction only required the jury to find that he accessed the computer "to commit theft." We perceive no meaningful distinction between the statute and jury instruction.

■ Defendant also argues the instruction is deficient because it failed to set forth the elements of theft. However, the instruction immediately preceding the computer crime instruction set forth the elements of theft from an at-risk adult, which include all the elements of the crime of theft, with the added element of the status of some of the victims in this case as at-risk adults. Thus, taken as a whole, the jury instructions adequately informed the jury of the law.

### VI. Theft from an At–Risk Adult

■ Defendant contends there was insufficient evidence to sustain his convictions for theft from an at-risk adult. We agree.

The statute governing theft from an at-risk adult provides:

Any person who commits theft, and commits any element or portion of the offense in the presence of the victim, as such crime is described in section 18–4–401(1), and the victim is an at-risk adult ... commits ... a class 3 felony if the value of the thing involved is five hundred dollars or more.

Section 18–6.5–103(5). As relevant here, an at-risk adult is any person who is sixty years of age or older. Section 18–6.5–102(1), C.R.S.2005.

A person commits theft when "he knowingly obtains or exercises control over anything of value of another without authorization, or by threat or deception." Section 18–4–401(1), C.R.S.2005. A thing of value is defined as that of another if anyone other than the defendant has a possessory or proprietary interest in it. Section 18–4–401(1.5), C.R.S.2005.

Defendant does not dispute that the victims, ages seventy and seventy-eight at the time, qualified as at-risk adults. He argues, however, the evidence failed to show these two individuals were victims of any theft because, although they signed the checks to Rautena, they did not do so in their individual capacities. Instead, one victim signed his check on behalf of a family trust, and the other signed on behalf of a common stock company.

The testimony presented by these two victims made only short and passing reference to the sources of the funds they provided defendant. While the evidence was sufficient to support a reasonable inference the trust and the corporation were victims of theft, it only shows these individuals served as conduits for the money between the corporation and trust and defendant. *See People v. Singer*, 663 P.2d 626, 627 (Colo.App.1983)(attorney who provided funds to defendant from company "merely the conduit through which defendant misappropriated the funds").

The prosecution provided no explanation of whether or how either of these individuals had a possessory or proprietary interest in the funds they turned over to defendant. As a result, we conclude there is insufficient evidence in the record to support a finding they were victims of theft. Therefore, we reverse defendant's two convictions of theft from an at-risk adult.

## VII. Constitutionality of Computer Crime Statute

Defendant contends his conviction for computer crime must be vacated because the applicable version of § 18–5.5–102, the statute defining the crime, is unconstitutionally vague and overbroad. We disagree.

Statutes are presumed constitutional, and the party challenging the validity of a statute has the burden of proving its unconstitutionality beyond a reasonable doubt. *People v. Zinn*, 843 P.2d 1351 (Colo.1993).

### A. Vagueness

In determining whether a statute is void for vagueness, the inquiry is whether the statute "forbids or requires the doing of an act in terms so vague that persons of ordinary intelligence must necessarily guess as to its meaning and differ as to its application." *People v. Becker*, 759 P.2d 26, 31 (Colo. 1988) (quoted in *People v. Gross*, 830 P.2d 933, 937 (Colo.1992)). The party challenging a statute on the ground of vagueness must demonstrate, beyond a reasonable doubt, that the statute is impermissibly vague in all its applications. *People v. Czemerynski*, 786 P.2d 1100 (Colo.1990).

The computer crime statute in effect at the time of defendant's crimes provided that a person commits a computer crime if the person "knowingly uses any computer, computer system, computer network, or any part thereof for the purpose of devising or executing any scheme or artifice to defraud; obtaining money, property, or services by means of false or fraudulent pretenses, representations or promises; using the property or services of another without authorization; or committing theft." Colo. Sess. Laws 1983, ch. 202, § 18–5.5–102(1) at 70506.

A "computer" is defined as "an electronic device which performs logical, arithmetic, or memory functions by the manipulations of electronic or magnetic impulses, and includes all input, output, processing, storage, software or communication facilities which are connected or related to such a device in a system or network." Colo. Sess. Laws 1978, ch. 168, § 18–5.5–101(2) at 728. This definition is not confusing or overly technical. The language of the statute is readily understandable by an ordinary person of reasonable intelligence.

The evidence showed defendant used a generic, Microsoft Windows-based computer. This device fell well within the statutory definition of a computer. Thus, defendant is unable to demonstrate the computer crime statute is vague in all its applications or vague as applied to him.

Accordingly, defendant has not established, beyond a reasonable doubt, that the computer crime statute is unconstitutionally vague.

## B. Overbreadth

The overbreadth doctrine is used primarily to challenge statutes threatening the exercise of fundamental constitutional rights. *People v. Mason*, 642 P.2d 8 (Colo. 1982). A statute is facially overbroad if, in addition to proscribing conduct that is not constitutionally protected, its proscriptions sweep in a substantial amount of activity that is constitutionally protected. *People v. Shepard*, 983 P.2d 1 (Colo.1999).

Defendant contends the computer crime statute is overbroad because a computer or part of a computer could be almost anything under the statutory definition. Therefore, he submits that a computer crime charge could be brought in almost all theft cases. However, defendant does not argue his conduct was constitutionally protected.

Except for First Amendment issues, one who is not personally adversely affected by the particular alleged constitutional defect lacks standing to challenge the constitutionality of the statute on the grounds of overbreadth. *People v. Lee*, 717 P.2d 493 (Colo. 1986). Thus, as defendant does not rely upon the First Amendment as the basis for his overbreadth argument, we conclude he lacks standing to raise this issue.

The judgment is reversed as to the two convictions of theft from an at-risk adult. The judgment is affirmed in all other respects. The case is remanded to the trial court to enter an order vacating the convictions and sentences for the two counts of

theft from an at-risk adult. The mittimus shall be amended accordingly.

Judge WEBB and Judge METZGER * concur.